Cook vs. Jones.

---

## COOK *vs.* JONES.

When the verdict of the jury is strongly and decidedly against the weight of evidence, not only as to the amount of damages found, but the right of the plaintiff to recover at all, and the Circuit Judge grants a new trial, this court will not interfere.

Case, in Muscogee Superior Court. Tried before Judge WORRILL, at November Term, 1858. Motion for new trial granted at May Term, 1859.

This was an action on the case brought by Ann C. Cook against Seaborn Jones, for building and erecting a mill dam across the Chattahoochee river, thereby wrongfully causing the water of said river to back upon and overflow the premises of plaintiff, lying and situated on said river, above said mill dam.

The defendant pleaded, first, the general issue; second, a license from the former owner of the premises alleged to be overflowed, to erect and build said bridge to its present height; and third, the statute of limitations, that said dam had been erected more than seven years, and that defendant had been in the quiet and peaceable enjoyment of the right to back the water and overflow the land of plaintiff, for and during all that period.

At the trial, plaintiff introduced in evidence a grant from the State to James C. Cook, for the premises overflowed. The last will and testament of said Cook, by which the land in question was devised to Ann C. Cook, his widow, the plaintiff, for and during her natural life.

*William H. Mitchell,* for and on the part of plaintiff, testified that the land of the plaintiff is bounded on the west by the Chattahoochee river—went to the dividing line between plaintiff and defendant in 1840—he thinks, with his step-father, James C. Cook, who showed witness the line, one that has been so considered for twenty-five years—the fence is on the line—it is some three-quarters of a mile from the city of Columbus—knows but little about water-power—thinks that the water was raised in the channel of the river on plaintiff's line—don't know how much, but thinks some two or three feet; that the defendant erected a dam on the Chattahoochee river, upon his own land, and below the land of the plaintiff, about the year 1839—thinks this dam caused the rise of water on plaintiff's line—went to defendant's mill some time after the dam was broken in the spring of 1841, when the mill was rented to one Bridges; he was grind-

Cook vs. Jones.

ing with the dam some three or four feet high, as witness thinks, and with a peculiar kind of wheel, thinks it was a cast wheel—don't know how high the dam was, and has not been to the mill in fifteen years—thinks that the water-power of the plaintiff was damaged by the dam at least one hundred dollars. James C. Cook died in the autumn of 1844.

*N. Nuchols* sworn, for plaintiff, testified that he was a mill-wright—knows all about mills and water-power—knows the line between plaintiff and defendant—went to the line in 1855, when the dam was broken, and the river low, and nailed a measuring rod to the root of a tree at plaintiff's line, in the water, and went there one year after, when the dam was mended, and found the water raised in the channel of the river, on plaintiff's line, five feet eight inches and three-quarters higher than when he measured it a year previously. That the measurements were made when the water in the river was at an ordinary stage, at its average height. Thinks that if plaintiff wished to use or sell her water-power, that the dam would injure its value from one to two thousand dollars, may be ten thousand dollars.

Here plaintiff rested.

### Evidence for Defendant.

*Richard Powell* testified that Dr. Ingersoll built the first dam before the year 1839. Upton erected a dam for Jones in 1839, this dam raised the water higher than the old dam; the dam built by Upton, in 1839, was partially destroyed in the spring of 1841 by a freshet, sixty or eighty yards next the eastern bank, leaving the mill house near the middle of the river. In the fall of 1841 or 1842, Jonathan Bridges, under the direction, and in the service of defendant, moved the mill house to the then eastern bank, and about fifty yards lower down, and the dam was repaired, and a low basin dam was built round to the mill

house. The dam repaired did not supply a sufficient quantity of water, and witness assisted Bridges to place rafts upon the dam to raise the water higher—by this means the water was raised some four or five feet high on the dam—the rafts were placed there some time between 1841 and 1843, but does not know the precise time—does not know when J. C. Cook died, and therefore cannot say whether it was during his life; thinks defendant has expended upon the mill and machinery five or ten thousand dollars. Since the erection of the dam by Upton, there is from 12 to 18 inches fall from the orignal site of the mill to where it now stands (some fifty steps lower down the river.) The freshet of 1841 did not entirely stop the mill, but it continued to grind a little up to the time the mill house was removed below by Bridges.

*Joseph Jefferson* sworn, says that he went to the mill in in 1845—witness repaired the dam in 1845—the dam as repaired was lower than the old dam, as can be seen by the water falling from the old dam—the new dam is some fifty yards below the site of the original dam on the eastern side of the river, and is lower than the old dam—was planked and the cracks stopped, because the old dam leaked, and had sunk in places, and would not hold water enough for the mill, and has continued to be repaired up to this time.

*R. L. Bass* testified that he was a civil engineer—examined the premises—took the level of the water on the 24th May, 1858, when the water was running over the dam, and found the level of the water at the dam to be 30-100 of a foot lower than at the line between plaintiff's and defendant's land above. In taking this level, did not take the level of the bottom of the river, owing to the irregularities of the bed of the stream, no accurate level could be taken on a general average, but the level of the surface of the river can be accurately taken, and was taken as stated; upon the day the level was made, the

dam did not back the water to plaintiff's line; from the point to which the back water reached, to plaintiff's line, there was a fall of 30-100 of a foot—from the level of the water in the waste-way under the wheel (which was blasted out) to the level of the water in the pond was about seven feet.

*David W. Upton* examined by commission, deposed that he knew James Cook in his life time—built a house for him at one time. Witness is a mill-wright, and has worked at the trade since 1822. He was employed by Seaborn Jones to build a mill dam across the Chattahoochee river, just above the city of Columbus, and to erect a grist mill—commenced in May, 1838, and finished the latter part of 1839. He took the level of the river from where the dam was built to the line that divided the land of Jones and James Cook, he took this level in order not to overflow Cook's land by raising the water too high, intended to build the dam five feet high. While he was framing the dam, Cook was there a number of times, had a conversation with him, and informed him that the dam was to be built five feet high, but that it would be better to raise it six feet. Cook at first objected to its being raised six feet, but concluded by giving witness permission to raise it six feet, as he, Cook, did not think that it would materially injure his land above, and the dam was raised accordingly. Jones was absent from home at the time the plan of making the dam six feet high, instead of five, was thus made, with the consent and approbation of Cook. After Jones returned, witness informed him of the change in the dam, and he seemed satisfied with the arrangement.

*To Cross Interrogatory.*—Dam was finished, according to the best of his recollection, in the latter part of 1839—does not know where the present dam is. The levels were taken to the line dividing the lands of Cook and Jones, from the dam, and the fall was just five feet, and that was the

38

height first intended for the dam, but by Mr. Cook's consent the dam was built one foot higher—he consented to the erection of the dam, but witness did not state to him that the dam when built would back water on him—if Cook made any mark on the tree, or notified witness or Col. Jones that if the dam backed water on him he would object—witness has no recollection of the same, and does not believe that such was the case. The dam did back water on Cook's land, and he did not object to it, as witness knows—does not know of any of suit being brought by Cook against Jones after the dam was built, but before the dam was framed, Cook threatened suit against Jones, but afterwards, when the dam was erected, he appeared satisfied. The freshet did not wash away the dam, but as to doing away the necessity of the suit, deponent saith not. Did not state to Cook that the dam would not back water on him, but told him that it would.

Here defendant closed.

Plaintiff in reply, proved by David Wynn, that in 1845 he worked on the dam for Bridges, the lessee of Jones—put some rafters on it, and planked up the dam, and raised the water some four or five feet on the dam. Did not measure the water, but calculated the depth of the head by the velocity of the wheel, as is customary among millers—placed the rafters over the old dam because it was sunk down in places, leaked and would not hold water enough. Repaired dam in 1851, and made it raise the water higher than before, it having sunk down in parts and leaked. Built another dam in 1855, lower down, by the order of Jones, commenced on the western bank of the river, as near the old dam as he could, and run diagonally across the stream to the island where the mill house now stands, to assist the old dam to hold the water; the new dam was built because it was cheaper and easier to build a new dam than to repair the old one—new dam raises the water about five feet—there are 12 or 18 inches more

Cook vs. Jones.

fall at the place where the mill now is than at the place where it originally stood. Is well acquainted with the river, and it was over the average height on the 24th of May, 1858.

*Benoni Smith* for plaintiff, testified that he worked on the dam for Bridges, Jones' lessee, in the fall of 1844, and suggested to Bridges to put flash boards on the dam, but he did not do it. Saw James C. Cook at the mill while he was working on the dam—was stopping the cracks, and planking the dam, because it leaked and did not hold water enough. Bridges tried to work a breast wheel, but could not succeed. Has been a great deal on the river, and on the 24th May, 1848, the river was high, above an average height.

*D. W. Upton* for plantiff, deposed that he had been examined in the case by defendant. Witness in his answers then did say, that James Cook consented to the erection of a dam six feet high. Witness meant to say that Mr. Cook came to the mill site one day when witness was framing said dam, designing to build it five feet high—witness said to Mr. Cook that it would be very desirable to have another foot added to the height, to which he objected. Witness then explained to him that he had leveled the river from the mill site up to the place Col. Jones had pointed out as the line between them, and found five feet fall from the bottom of the shoal at the mill site up to the top of the water at said line. Witness further explained to Mr. Cook that he thought the sheet of water which would pour over the dam would be one foot thick, and that taking the dam to be five feet high, the water would be raised one foot above its natural state or level at said line, and by making it one foot higher, the water would be raised another foot at said point. Mr. Cook then said if that were the case, he had no objection, for that he did not believe that the two feet back water would overflow, or at all injure his low grounds—he expressed

fears that in time of a freshet the dam six feet high would cause the water to back upon him and overflow his low grounds, more than it otherwise would do.    Witness told him he thought he need not apprehend such a result, as a freshet was less perceptible above a dam than elsewhere, after this statement, Mr. Cook seemed satisfied, and gave his consent to the erection of the dam six feet high.    Wit: ness went on and built the dam six feet high, and don't recollect that he ever had any other conversation afterwards with Mr. Cook, relative to the dam.    Mr. Cook consented to have the water raised two feet high at the time, but objected all the time to its being thrown back on his low grounds.    Both witness and Cook understood that a dam six feet high would raise and back the water two feet at the line between him and Jones, and believes that the consent of Mr. Cook was given to the raising of the dam one foot higher, under the belief that the water would not be raised more than two feet above its ordinary height at said line—when he said that he did not think the six foot dam would injure him, he meant that two feet of back water would not, as witness understood him; witness has no recollection of making the fall seven feet and a half, or six feet and half—his recollection is that it was five feet or thereabouts.    He did not report seven and a half or six and a half feet to Mr. Cook, either alone or in the presence of any one or more persons.

Here the testimony closed.

The court charged the jury, who returned a verdict of one thousand dollars for the plaintiff, whereupon defendant moved for a new trial, upon the following grounds, to-wit:

First. Because the jury found contrary to law.

Second. Because the verdict is contrary to evidence.

Third. Because the verdict is contrary to the weight of evidence.

Bond et al. vs. Monro.

Fourth. Because the jury found contrary to the charge of the court.

Fifth. Because the damages are excessive.

Plaintiff offered to write off the damages to an amount which the court might deem reasonable, if it thought them excessive.

After argument, the presiding judge set aside the verdict and granted a new trial, to which decision counsel for plaintiff excepted.

JOHNSON & SLOAN, for plaintiff in error.

JONES & JONES, contra.

Judge BENNING being related to defendant in error, did not preside in this case.

By the Court.—LUMPKIN, J., delivering the opinion.

Are we constrained to reverse the judgment of the circuit judge setting aside the verdict of the jury, and ordering a new trial in this case? So far from it, we concur with him in holding that the finding of the jury was strongly and decidedly against the weight of evidence, not only as to the amount of damages, but the right of the plaintiff to recover at all in this case.

Judgment affirmed.